UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CHI MING YAU,
individually and on behalf of all others similarly
situated,

               Plaintiff,

          -v-                                      1:23-CV-01185 (AJB/TWD)

THE MIGHTY CRAB NY 12110 INC., D/B/A THE
MIGHTY CRAB LATHAM, ZHUI ZHENG, and
AMY CHEN,

               Defendants.
_____

**Hon. Anthony J. Brindisi, U.S. District Judge:**

## DECISION & ORDER

Defendants Zhui Zheng ("Zheng"), Amy Chen ("Chen"), and The Mighty Crab NY 12110 Inc., doing business as The Mighty Crab Latham ("MCNY"), (collectively, "defendants") move for summary judgment pursuant to Federal Rule of Civil Procedure 56 against plaintiff Chi Ming Yau ("Yau"). *See* Dkt. No. 42-2 at 6. For the following reasons, defendants' motion for summary judgment will be **DENIED**.

**I.    BACKGROUND**[1]

On or about September 21, 2022, Zheng, an owner of MCNY, hired Yau to work at "The Mighty Crab," a seafood restaurant operated by MCNY and located in Latham, New York. Dkt. No. 42-21 ¶¶ 3–6; Dkt. No. 43-4 ¶¶ 3–6. Yau, often referred to by his English nickname, "Tom,"

---

[1] The following facts are undisputed unless otherwise indicated. They are taken from defendants' Rule 56.1 Statement (Dkt. No. 42-21), plaintiff's Rule 56.1 Counterstatement (Dkt. No. 43-4), and the materials submitted to the Court by both parties in connection with these respective statements.

worked at the establishment for a little under a year, between late September 2022 and early August 2023.  Dkt. No. 43-4 ¶ 8.  At all relevant times, The Mighty Crab "employed two (2) or more employees" and "was an enterprise engaged in commerce with more than five hundred thousand dollars ($500,000.00) gross annual revenue."  *Id.* ¶¶ 6–7.

Defendant Zheng, defendant Chen, and non-party owner Cheng Chen possessed the authority to hire, discipline, and fire employees and, particularly, could exercise "decision-making authority with respect to Yau's employment, or manage[] or supervise[] Yau's work[,] or assign[] Yau tasks or duties."  *Id.* ¶ 11.  Among her job duties, defendant Amy Chen was "responsible for calculating the time Yau worked, issuing and authorizing weekly paychecks, and maintaining payroll records[;]" though, as Yau acknowledges, Chen "primarily worked as a cashier."  *Id.* ¶¶ 14–15.  Work performed by Yau, at least according to the parties' Rule 56.1 statements, was "directly essential to The Mighty Crab."[2]  *Id.* ¶ 10.  "Throughout his employment, Yau was paid $5,500.00 per month, consisting of checks in the gross amount of $2,000.00 per fortnight, plus cash."  *Id.* ¶ 17.

## II.   STANDARD OF REVIEW

"Summary judgment is appropriate only when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Williams v. N.Y. City Hous. Auth.*, 61 F.4th 55, 68 (2d Cir. 2023); FED. R. CIV. P. 56(a).  "'A fact is *material* when it might affect the outcome of the suit under governing law,' and '[a]n issue of fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the

---

[2] "Plaintiff does not dispute" that "[a]t all relevant times, the work [he] performed . . . was directly essential to the Mighty Crab."  Dkt. No. 43-4 ¶ 10.  "However, Plaintiff alleges that his job [was] essential not because he did any management work."  *Id.* (citing "Pl. Depo. at 29:2-23").  As part of a consistent pattern (by both parties in this matter), the citation Yau provides fails to support the proposition for which it is asserted.  Instead, it directs the Court to a portion of Yau's deposition in which defendants' counsel reminds him of his obligation to answer questions truthfully under penalty of perjury.  *See* Dkt. No. 43-5 at 8.

nonmoving party.'" *New York Univ. v. Factory Mut. Ins. Co.*, 374 F. Supp. 3d 315, 322 (S.D.N.Y. 2019), *aff'd,* 2021 WL 3136078 (2d Cir. July 26, 2021) (summary order) (emphasis in original) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In determining whether there are genuine issues of material fact, the Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). Nevertheless, "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion[,]" *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002), and summary judgment will be warranted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Stated differently, if the movant meets their burden, "the non-moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008), *certified question accepted sub nom. Jaramillo v. Weyerhaeuser Co. & Tech. Licensing Assocs.*, 11 N.Y.3d 744 (N.Y. 2008), and *certified question answered,* 12 N.Y.3d 181 (N.Y. 2009). The role of the Court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kee v. City of N.Y.*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)); *see also Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.").

## III. DISCUSSION

As presented in plaintiff's operative First Amended Complaint ("FAC"), Dkt. No. 17, Yau claims entitlement to unpaid overtime, pursuant to the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"), in addition to just compensation for untimely payment of wages alongside improperly withheld spread-of-hours pay under the NYLL.[3]  *Id.* at 10–12.

Defendants, in turn, contend that, as a matter of law ,Yau is entitled to no such recovery. They argue the evidentiary record reveals that Yau was a "manager" at the Mighty Crab, which is an executive position rendering him exempt from the allegedly applicable statutory requirements.  Dkt. No. 42-22 at 6 ("[T]hroughout his employment, [Yau was] an[ ] executive employee exempt from receiving overtime under the FLSA," and "an executive ([rather than] a manual worker) not covered by the NYLL's overtime, spread of hours, [or] timely-payment provisions."); *see also* Dkt. No. 42 at 1 ("Plaintiff was an [FLSA] exempt executive employee . . . and an [NYLL] executive non-employee").  Yau, unsurprisingly, maintains that the record divulges nothing of the sort and opposes summary judgment.  According to Yau, disputes of fact over his job status necessitate a jury trial.

### A. Exemption Status Under FLSA and NYLL

"Subject to certain exceptions, the FLSA, and the analogous provisions under [the] NYLL, require employers to compensate employees who work more than forty hours per week at a rate of one and one-half times their regular rate of pay." *Sexton v. Am. Golf Corp.*, 2015 WL 5884825, at *3 (E.D.N.Y. Oct. 8, 2015); *see* 29 U.S.C. § 207(a)(1); *see also* 12 N.Y.C.R.R.

---

[3] Yau's initial Complaint included two additional counts labeled "Violation of New York Labor Law—Time of Hire Wage Notice Requirement" and "Violation of New York Labor Law—New York Pay Stub Requirement," *see* Dkt. No. 1 at 12–13, that he has since dropped voluntarily.  *See* Dkt. No. 18.

§ 146-1.4 ("An employer shall pay an employee for overtime at a wage rate of 1 1/2 times the employee's regular rate for hours worked in excess of 40 hours in one workweek.").[4]

"The . . . overtime pay provision, however, does not apply to 'any employee employed in a bona fide executive . . . capacity.'" *Sexton*, 2015 WL 5884825, at *3 (quoting 29 U.S.C. § 213(a)(1)); *see also* 12 N.Y.C.R.R. § 146-3.2(c) ("Employee . . . does not include any individual permitted to work in, or as . . . an executive.").

Whether an employee falls within the executive exemption is a mixed question of law and fact that depends, in large part, on the employee's actual job characteristics and duties. *Pippins v. KPMG, LLP*, 759 F.3d 235, 239 (2d Cir. 2014) ("'The question of how the employee[] spent their working time is a question of fact. The question of whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.'") (quoting *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 559 (2d Cir. 2012)).

"The FLSA does not define what it means to work in an 'executive capacity'[;] instead[,] [it] directs the Secretary of Labor to define and delimit that term through regulations." *Elghourab v. Vista JFK, LLC*, 2019 WL 2431905, at *7 (E.D.N.Y. June 11, 2019), *aff'd,* 818 F. App'x 63 (2d Cir. 2020) (summary order) (internal alterations and citations omitted). In turn, the U.S. Department of Labor has promulgated the following four-factor test: An "employee employed in a bona fide executive capacity" is any employee "(1) [c]ompensated on a salary basis pursuant to [29 C.F.R.] § 541.600" . . . ; (2) [w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or

---

[4] "Because the NYLL applies the same exemptions as the FLSA, the Court draws from caselaw addressing the FLSA and the NYLL exemptions interchangeably." *Hong v. Mommy's Jamaican Mkt. Corp.*, 2023 WL 6122904, at *2 n.2 (S.D.N.Y. Sept. 19, 2023); *Gonzalez v. Tremson Recycling LLC*, 2025 WL 964253, at *1 (S.D.N.Y. Mar. 31, 2025) (citing *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012) ("The Second Circuit engages in a single analysis under the FLSA to resolve both FLSA and NYLL exemption defenses.")).

subdivision thereof; (3) [w]ho customarily and regularly directs the work of two or more other employees; and (4) [w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a) (2020).

With respect to the first factor, there is no genuine dispute of fact. "To qualify as an exempt executive . . . employee[,] an employee must be compensated on a salary basis at a rate of not less than $684 per week[.]" 29 C.F.R. § 541.600(a) (2020). "An employee will be considered . . . paid on a 'salary basis' . . . if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602 (2020); *see also* 12 N.Y.C.R.R. § 146-3.2(c)(1)(i) ("Work in a bona fide executive capacity means work by an individual . . . (e) who is paid for his services a salary, inclusive of board, lodging or other allowances and facilities, of at least the amounts listed below when working . . . (3) [o]utside of New York City, Nassau, Suffolk and Westchester counties[:] $990.00 per week on and after December 31, 2021; $1,064.25 per week on and after December 31, 2022; $1,124.20 per week on and after January 1, 2024[.]").

Yau concedes as much. In his opposition papers, Yau states, "Plaintiff does not dispute the first requirement," *i.e.*, that he was compensated on a "salary basis," and acknowledges that his salary surpassed the required minimum thresholds, as he "was paid $5,500.00 per month[.]" *See* Dkt. No. 43 at 12–13; Dkt. No. 43-4 at 4, ¶17.

6

While the Court finds the first prong satisfied, its analysis must end there.  Legal review of the remaining prongs requires consideration of the relevant facts.  However, such a review is not possible, as the parties appear to disagree on the existence of nearly every material fact.

"[T]he application of an exemption . . . is a matter of affirmative defense on which the employer has the burden of proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974).  As "inquiries into employees' FLSA-exempt status are fact-intensive, '[e]ven where there has been full discovery, courts are often reluctant to grant summary judgment based on [an FLSA] exemption.'"  *Cheng Chung Liang v. J.C. Broadway Rest., Inc.*, 2015 WL 5439178, at *2 (S.D.N.Y. Sept. 15, 2015) (quoting *Indergit v. Rite Aid Corp.*, 2010 WL 1327242, at *7 (S.D.N.Y. Mar. 31, 2010)).

As defendants acknowledge, "whether an employee is exempt is a question rarely susceptible of resolution on a motion for summary judgment." Dkt. No. 42-22 at 14.  Yet defendants submit that "this case is an exception." *Id.*  It is not.

> Defendants assert:
>
> [Yau] spent the bulk of his time . . . performing exempt work[.] *See* 56.1 Statement ¶¶ 18, 21–24.  [P]laintiff's exempt management work included[] interviewing and selecting employees (*see* 56.1 Statement ¶¶ 19, 25, 30); setting and adjusting employee[] pay rates and hours of work (*see id.* ¶¶ 18, 25); directing the work of employees (*see id.* ¶ 20); disciplining employees (*see id.* ¶ 19); planning the work (*see id.* ¶¶ 18, 20); apportioning work among employees (*see id.*); determining the type of materials, supplies, and merchandise to be bought, stocked and sold (*see id.* ¶ 18); and implementing legal compliance measures . . . (*see id.* ¶ 25).

Dkt. No. 42-22 at 17–18.

They maintain that "[t]he importance of [Yau's] nonexempt work was low," noting that "for the most part he did not tend bar," while "the importance of his exempt work…making sure the restaurant's front-of-the-house ran smoothly. . . was high." Dkt. No. 42-22 at 17 (using the signal 'cf.' followed only by "[Defs.'] 56.1 Statement ¶¶ 10, 18–20, 22–24" as support from the

7

evidentiary record).[5] Defendants further maintain that Yau "supervised the front-of-the house employees[,] making sure [the employees] stayed on task and did their jobs well, giving [them] tasks to do (including waiting particular tables and rolling silverware in napkins), enforcing work rules [and] the uniform dress code (from which [Yau] was exempt), and handling customer complaints and questions." Dkt. No. 42-22 at 19 (citing Defs.' Rule 56.1 Statement ¶ 20).

Defendants continue: Yau "[f]rom time to time . . . placed want-ads on behalf of The Mighty Crab, giving his telephone number as the number prospective employees should call." Dkt. No. 42-22 at 19 (citing Defs.' Rule 56.1 Statement ¶ 30). "Once prospective employees came forward, he would help interview them and would give them wage notices." Dkt. No. 42-22 at 19 (citing Defs.' Rule 56.1 Statement ¶ 25). "Plaintiff had authority to hire, discipline, and fire employees." Dkt. No. 42-22 at 19 (citing Defs.' Rule 56.1 Statement ¶ 19). "He promulgated work rules, that he signed 'Manager Tom,' and . . . he could discipline employees for violation." Dkt. No. 42-22 at 19 (citing Defs.' Rule 56.1 Statement ¶¶ 19, 20). "He fired at least one server." Dkt. No. 42-22 at 19 (citing Defs.' Rule 56.1 Statement ¶ 20).

But these arguments must be rejected. Defendants rely heavily on purportedly undisputed "facts" set forth in their Local Rule 56.1 Statement. However, a review of that statement, and the underlying exhibits it cites, confirms that defendants have not demonstrated entitlement to judgment as a matter of law. Courts in this district have made the point often enough, but it bears repeating: The mere inclusion of an averment of "fact" in a Local Rule Statement is not sufficient to establish its truth for purpose of summary judgment. *See* N.D.N.Y.

---

[5] "The signal 'cf.' is an abbreviated form of the Latin word confer, meaning 'compare.' It directs the reader's attention to another part of the work, to another volume, case, etc., where contrasted, analogous, or explanatory views or statements may be found." *N. Tankers (Cyprus) Ltd. v. Backstrom*, 967 F. Supp. 1391, 1401 (D. Conn. 1997) (quoting Black's Law Dictionary 229 (6th ed. 1990)); *see also Bluebook* Rule 1.2(a) (When using 'cf.', "[t]he citation's relevance will usually be clear to the reader *only if* it is explained.") (emphasis added).

L.R. 56.1(a) ("Each fact listed shall set forth a specific citation to the record where the fact is established.").

Defendants' heavy reliance on their Rule 56.1 Statement—seemingly to divert attention from the actual exhibits submitted with their motion—only underscores the lack of evidentiary support required to justify summary judgment. A review of the cited exhibits confirms these deficiencies. Defendants submit nineteen exhibits in support of their motion, but the sheer volume serves more to distract than persuade. Ultimately, defendants fail to provide the substantive, undisputed evidence necessary to merit the grant of their motion.

For instance, defendants submit a photograph of a handwritten notice—written in English—in which Yau appears to request that service staff provide their availability for a certain specific week. *See* Exh. I, Dkt. No. 42-10. Defendants offer similar photographs of handwritten notices, likewise in English, purportedly authored by Yau and addressed to "all staff," which include directives such as "whoever uses a plastic cup or silverware will have to pay a dollar," that defendants will begin charging a five-percent fee on credit card tips, that employees scheduled to close may not clock out before certain specified times, and that employees should "not chat, text, or play games with [their] cell phone[s] during working hours[.]" *See* Exh. J, Dkt. No. 42-11 at 3–6.

In addition, defendants submit two exhibits: one they claim contains text messages between defendants and Yau, and the other a screenshot of a "Help Wanted" advertisement purportedly posted by Yau on Dadi360. *See* Exh. Q, Dkt. No. 42-18; Exh. P, Dkt. No. 42-24 at 2. However, both exhibits are in a foreign language, and defendants have not provided a certified translation of their contents (or, for that matter, any translation at all). As courts in this Circuit have made clear time and time again, "a document in a foreign language is generally

9

inadmissible unless accompanied by a certified English translation." *Chen v. Wai? Cafe Inc.*, 2016 WL 722185, at *6 n.5 (S.D.N.Y. Feb. 19, 2016) (collecting cases). Accordingly, consistent with that clear line of trial-court authority, the Court will not consider defendants' foreign-language documents. *Heredia v. Americare, Inc.*, 2020 WL 3961618, at *5 (S.D.N.Y. July 13, 2020) (collecting cases).[6]

The remaining exhibits offered by defendants speak only to Yau's salary and pay schedule,[7] consist of defendants' court filings or discovery responses,[8] or are declarations from defendants' customers or employees.[9]

The Court does not mean to suggest that defendants have provided *no* evidence. However, the evidence they have offered is primarily testimonial in nature. Accordingly, at this stage, Yau can—and does—sufficiently dispute nearly all of it, at least for purposes of summary judgment.

Yau asserts that he "worked as a bartender[,] and his regular duties were to serve the patrons, carry beverages and beers, cut fruit, answer phone calls, purchase beers and once in a while buy[] supplies from Restaurant Depot." Dkt. No. 43-4 ¶ 18. He explains that he procured supplies only because "[defendant] Chen does not know how to drive" and he "was helping her." *Id.*

---

[6] The Court reminds the parties that they "must provide certified translations of any foreign language documents that they seek to introduce at trial." *NV Petrus SA v. LPG Trading Corp.*, 2017 WL 1905820, at *2 (E.D.N.Y. May 8, 2017).

[7] *See* Pl.'s W-2s, Exh. D, Dkt. No. 42-5; Pl.'s Paystubs, Exh. E, Dkt. No. 42-6; Defs.' Ledger of Cash Payments, Exh. F, Dkt. No. 42-7; Pl.'s Bank Statements, Exh. G, Dkt. No. 42-8; Defs.' Pay Information Demonstrative, Exh. H, Dkt. No. 42-9.

[8] *See* Mighty Crab's Certificate of Incorporation, Exh. A, Dkt. No. 42-2; Defs.' Response to Pl.'s Interrogatories, Exh. B, Dkt. No. 42-3; Defs.' Initial Disclosures, Exh. K, Dkt. No. 42-12.

[9] *See* Giordano Decl., Exh. L, Dkt. No. 42-13; Martins Decl., Exh. M, Dkt. No. 42-14; Tucker Decl., Exh. N, Dkt. No. 42-15; Welch Decl., Exh. O, Dkt. No. 42-16.

In fact, Yau denies having any managerial authority. He states that he did not "determine employees' work hours or work schedules, determine employees' status as exempt or nonexempt, [or] calculat[e] employees' time worked." *Id.* He further asserts that he "had no authority to hire, discipline, and fire employees," *id.* ¶ 19, and that he did "not supervise any employees," *id.* ¶ 21. According to Yau, he did not manage the "front of the house," but rather served as a bartender and front desk worker. *Id.* ¶ 20. And he "d[id] not enforce work rules [or] uniform dress code[.]" *Id.*

Any action now cited by defendants as evidence of Yau's managerial authority or responsibility lacks crucial context, he says: he was merely acting as a conduit through which the defendants, particularly Chen, communicated with English speakers. *See, e.g.*, Pl.'s Depo., Dkt. No. 43-5 at 14 ("Q: Is it your testimony that, actually, you were always helping Amy [Chen] due to her lack of English fluency[—with] customer disputes, as well [as with] ordering . . . any food that the restaurant needed? A: That is right. I was the first Chinese [individual] that they hired[.] [T]hey hired me to help Amy—[to] help with any interpreting[.]"); *see also id.* ("Q: To clarify, you would be the main contact person because most employees spoke English and Amy did not? A. I guess you could put it that way."). *But see id.* at 23 ("Q: What makes you qualified to act as an interpreter; do you have any kind of certification? A: I never said I was an interpreter[.]").

Yau also expressly denies "all allegations and facts in defendants' . . . Exhibit M, Exhibit N, and Exhibit O," explaining that he "do[es] not know" the three declarants. Dkt. No. 43-2 ¶ 61. He similarly denies the assertions in defendants' Exhibit L, the declaration of former co-

11

worker Brianna Giordano, on the grounds that Giordano "had already left the restaurant in March 2024."[10]  Id.

Of course, a factfinder might well reject Yau's version of these events.  After all, Yau relies almost entirely on his uncorroborated deposition testimony and a self-serving declaration submitted in opposition to defendants' pending motion.  See Pl.'s Depo. Trans., Dkt. No. 43-5; Pl.'s Decl., Dkt. No. 43-2.  These submissions are "littered with vague answers, blatant attempts at obfuscation, and hyperbolic claims[.]"  See Sexton, 2015 WL 5884825, at *1.  Moreover, he demonstrates a selective memory,[11] a convenient ineptitude with technology,[12] and a marked disregard for his obligations in this matter.[13]

---

[10] Giordano's declaration pertains to the period during which defendants employed Yau—September 2022 through August 2023.  See Dkt. No. 42-13.  It is unclear to the Court how her departure from the restaurant seven months later is relevant here or provides Yau with a reasonable basis for denial.

[11] See United States v. Gerena, 695 F. Supp. 1379, 1390 (D. Conn. 1988); see, e.g., Pl.'s Depo., Dkt. No. 43-5 at 5 ("Q: What was the name of the company that you worked at[?]  A: I don't remember right now."); id. at 11 ("Q: What documents did you request of the bank?  A: I don't actually remember[.]"); id. at 12 ("Q: So, regardless of the reason, you would be the one that the employees would text if they were coming in late; is that correct?  A: Not necessarily.  Sometimes they passed it on to different colleagues.  Q: What are the names of those other colleagues?  A. [I] don't remember the names."); id. at 13 ("Q: Did you ever attempt to look for such messages?  A: No.  I read it[,] and that was that.  [H]owever, I remember most of them were . . . complaints about [defendant] Amy [Chen]."); id. at 16 ("Q: [D]id you walk away from that interview once the hire was made?  A: The details, I don't remember[.]"); id. at 17 ("Q: Are you familiar with an employee by the name of Desiree?  A: Maybe, I forgot.  I don't remember such a name."); id. at 20 ("Q: [W]ere you a plaintiff in a case against Geisha Asian Cuisine?  A: I'm sorry, I don't remember.  Q: You don't remember if you sued a restaurant before?"); id. ("Q: Were you the plaintiff in He Chen Restaurant Corp.?  A: I really don't have any memory or impression."); id. ("Q: Were you the plaintiff in a case against 66S Fusion Inc.  A: I don't remember"); id. ("Q: Are there any[] lawsuits that you have been involved in, Mr. Yau?  A: It's been so long, I don't remember."); id. at 23 ("I did not pay attention since it has nothing to do with me.  I did not pay attention; I did not look.  Q: You don't remember, is that correct?  A: I don't need to remember; it has nothing to do with me whatsoever."); id. at 25 ("Q: [T]here was a [restaurant] host at the time besides yourself; is that correct?  A: Yes.  Q: What is the name of that host or hostess?  A: I don't remember.").

[12] Pl.'s Depo., Dkt. No. 43-5 at 10.  ("Q: Regarding the text messages, have you kept all of the text[s] that were sent to you from 2022 to the present day?  A: Probably no; probably no more.  Q: Why would you say, 'probably no more'?  A: I never check[ed], I'm not a technical guy.  How could I possibly know how to answer your question, this question?  Q: [D]id you use [text messaging] from 2022 to the present day?  A: Yes.  Q: [D]id you use WeChat or any other social media platform to text?  A: Yes.  Q: Similarly, did you look up . . . any of the . . . messages from 2022 to present day . . . from the WeChat application?  A: First of all, I don't use WeChat[.]").

[13] Pl.'s Depo., Dkt. No. 43-5 at 32 ("Q: Sitting here today, you never searched your email inbox and outbox, correct?  A: [N]o.  Q. Have you reviewed your text message communications?  A. No.  Q. Did you review your cell phone camera records for responses to personal documents?  A. No.  Q. Did you search for paper files that might be responsive to the case?  A. No.  Q. Did you ever request a credit card statement from the bank[?] [Y]ou mentioned you had . . . a dozen or more credit cards[.]  A. I get a copy of the monthly statements every month, [but] still I don't really know which one was used to buy [supplies for the restaurant].  Q. Did you search or collect all the credit card

Even so, and despite the Court's skepticism about the persuasive value of many of Yau's assertions, its current task is to figure out whether material factual disputes exist, not to try to resolve them. Determining the precise nature of Yau's job duties, evaluating the credibility of his testimony, and considering the evidence (or lack thereof) are tasks reserved for a jury. *See, e.g.*, *Jibowu v. Target Corp.*, 492 F. Supp. 3d 87, 100 (E.D.N.Y. 2020) ("Plaintiff's deposition testimony and other evidence[,]" they contend, "indicat[e] that, in practice, [plaintiff] had few if any management responsibilities and little managerial authority. Despite the significant volume of evidence defendant proffers in support of its position, the Court concludes that there remain material facts in dispute as to whether [p]laintiff's primary duty . . . was, in fact, management."); *see also Sexton*, 2015 WL 5884825, at *1 ("[S]ummary judgment is only granted in the rare case where an employee's precise job duties are undisputed. This is not such a case.").

### IV.  CONCLUSION

Based on the current record, the most basic issue in this case—the nature of Yau's job duties—remains factually disputed. As a matter of law, the Court cannot award judgment to defendants without undisputed clarity on this threshold factual question, or on related issues, such as the comparative proportions of Yau's respective duties, whether any were managerial in nature, whether he "customarily and regularly direct[ed] the work of two or more other employees," or whether he had the "authority to hire or fire other employees[,]" or made "suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees [that were] given particular weight." *See* 29 C.F.R. § 541.100(a)(2)–(4) (2020).

---

statements from all the credit card companies that you have utilized from 2022 through 2023? A. Well[,] if you need to, you can check. A. [I]t's the other way around, not me, I am not here to search.").

For these reasons, defendants' motion for summary judgment must be **DENIED**.

**SO ORDERED.**

Dated: May 19, 2025
    Utica, New York.

Anthony J. Brindisi
U.S. District Judge